IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:17-CV-155-FL

| | | |
|---|---|---|
| NICHOLAS WEARE and SUSAN WEARE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| BENNETT BROTHERS YACHTS, INC., | ) ) ) | |
| Defendant. | ) ) | |

This matter comes before the court on defendant's motion for summary judgment. (DE 38). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendant's motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiffs, owners of a 53-foot sailing yacht listed for sale in 2016 through Oyster Brokerage USA ("Oyster"), initiated this action by complaint filed August 4, 2017, against defendant, the purchasers' representative and selling broker[1], asserting claims for breach of fiduciary duty, negligence, breach of contract, and unjust enrichment. These claims stem from defendant's delivery of proceeds paid by the Leonards to a person or persons unknown instead of plaintiffs.

After a relatively uneventful period of discovery, defendant filed the instant motion, predicated upon the argument it never represented plaintiffs' interests. Defendant relies upon

---

[1] Neither plaintiffs' broker, Oyster, or the purchasers, Gregory Leonard and Tracy Leonard (collectively "the Leonards"), are parties to the action.

deposition testimony of Patricia Bennett ("Bennett"), its president; Terry Rose ("Rose"), defendant's representative; Dan Wurzbacher ("Wurzbacher"), representative of the listing broker, Oyster; and plaintiff Nicholas Weare. Defendant also relies upon a myriad of documentary evidence.[2]

Plaintiffs argue in defense of motion that defendant breached its duty to protect their interests in the transaction, with reference to some additional testimony, including that of the purchaser, Gregory Leonard; Janice Chance ("Chance"), defendant's former controller; Jane Lascala ("Lascala"), an individual responsible for documenting sale of plaintiffs' yacht on behalf of the Leonards; and Jeffrey Cox ("Cox"), plaintiffs' expert on yacht sales. A scattering of additional documentary evidence makes its way into the case also through plaintiffs.[3]

**STATEMENT OF UNDISPUTED FACTS**

Plaintiffs, residents of Bermuda, contracted with Oyster through Wurzbacher on or about June 27, 2016, to list their 53-foot sailing yacht named "Magic" for sale. (Vessel Brokerage Agreement (DE 42-3) at 1–2). In the meantime, defendant, through its representative Rose, worked with the Leonards to locate a suitable yacht for purchase. (See Rose Dep. (DE 42-5) 43:23–48:4, 49:4–51:12, 55:3–4; Leonard Dep. (DE 45-20) 37:18–38:20). With input from their respective clients, Oyster and defendant successfully negotiated agreeable terms for the sale of

---

[2] The evidence includes the vessel brokerage agreement between plaintiffs and Oyster; the purchase and sale agreement between the Leonards and plaintiffs; Rose's email on March 29, 2017, together with the proposed closing statement for sale of plaintiffs' yacht; defendant's wire transfer receipt from April 7, 2017; fraudulent wire transfer instructions inserted by hackers; plaintiffs' arbitration demand against Oyster; plaintiffs' discovery responses; a bulletin from the Federal Bureau of Investigation ("FBI") warning of the dangers of compromised emails; and plaintiffs' expert report from the Oyster arbitration, explaining the ways in which Oyster mishandled plaintiffs' transaction.

[3] Plaintiffs' documentary evidence includes evidence of defendant's prior breaches of cyber security; articles from the Yacht Broker's Association of America ("YBAA") warning about funds transfer fraud; similar warnings from the FBI and the North Carolina State Bar; various email correspondence; addendum to the closing statement detailing broker fees; the YBAA's Guide for Professional Practice of Yacht Brokerage & Sales; a webpage listing YBAA's past presidents; and the arbitral award finding the Leonards did not breach the purchase and sale agreement.

Magic to the Leonards in February or March 2017. (Weare Dep. (DE 42-2) 62:21–64:12; Rose Dep. (DE 42-5) 51:11–52:6, 55:3–4, 56:3–14).

Defendant then prepared a purchase and sale agreement on a standard YBAA template,[4] identifying the selling and listing brokers as defendant and Oyster respectively, wherein plaintiffs agreed to sell Magic to the Leonards for $485,000.00. (Weare Dep. (DE 42-2) 66:11–14; Wurzbacher Dep. (DE 42-4) 23:7–9; Rose Dep. (DE 42-5) 68:18–23; Purchase and Sale Agreement (DE 42-6) at 1). Closing would be complete when

> BUYER confirmed that they are prepared to close; and, [a]ll documents necessary to transfer good and absolute title to the VESSEL are received by the BUYER, SELLING BROKER, or Documentation Service on behalf of the BUYER; and, [t]he balance of the PURCHASE PRICE is paid in collected funds to the SELLER or to the SELLING BROKER for transmittal to the SELLER.

(Purchase and Sale Agreement (DE 42-6) at 2). In addition, "[t]he SELLER and the BUYER each acknowledge that the SELLING BROKER represents the BUYER, and the LISTING BROKER represents the SELLER, each representing the party that the respective BROKER has brought to this transaction." (Purchase and Sale Agreement (DE 42-6) at 3).

On March 29, 2017, Rose dispatched to Oyster, the Leonards, and plaintiffs an email with attached proposed closing statement. (Rose Dep. (DE 42-5) 81:20–83:6; March 29, 2017 Email (DE 42-7) at 1–2). The email read:

> Attached please find the Closing Statement showing transfer and distribution of funds for the completion of sale for MAGIC and dinghy. Assuming your agreement, will the Sellers and Buyers sign the statement for authority to transfer funds. Greg and Tracy please wire funds to the [Bennett Brothers Yachts] Escrow Account on the morning of April 6th, 2017. Bennett Brothers will wire funds for closing on April 7th to the Weare[s] and Oyster, USA. Dan [Wurzbacher] please send me, confidentially, wiring instructions for the Weare[s] and Oyster, USA.

---

[4] The copy of the purchase and sale agreement presented to the court appears only to bear the signature of Gregory Leonard. (Purchase and Sale Agreement (DE 42-6) at 4). However, the parties do not dispute existence of a fully executed purchase and sale agreement in accordance with these terms. (See Pl. Statement of Facts (DE 44) ¶ 12; Weare Dep. (DE 42-6) 65:22–66:14).

3

(March 29, 2017 Email (DE 42-7) at 1). That same day, Wurzbacher emailed Rose wiring instructions for Oyster and plaintiffs, and confirmed that Oyster and plaintiffs agreed to the closing statement. (Rose Dep. (DE 42-5) 86:5–21; Wurzbacher Dep. (DE 45-24) 188:3–22; March 29, 2017 Email (DE 42-7) at 3).

Unbeknownst to anyone involved in the transaction, a person or persons unknown surreptitiously had gained access to and control over Rose's email account. (See Bennett Dep. (DE 42-1) 48:22–25; Rose Dep. (DE 42-5) 87:9–88:3; March 29, 2017 Email (DE 42-7)). An email containing fraudulent wire instructions was sent out of Rose's account to the rest of defendant's employees. (Bennett Dep. (DE 42-1) 80:13–81:4, 82:11–24; Rose Dep. (DE 42-5) 86:5–88:8).

On April 5, 2017, the Leonards wired the balance of the purchase price to defendant's escrow account. (Rose Dep. (DE 42-5) 149:17–21; Wire Receipt Apr. 5, 2017 (DE 45-8) at 1). Two days later, on April 7, 2017, defendant wired the balance of the purchase price pursuant to the fraudulent instructions previously given. (Wire Receipt Apr. 7, 2017 (DE 42-8) at 1; Fraudulent Wire Instructions (DE 42-9) at 1). The Leonards took possession of Magic on April 8, 2017. (Leonard Dep. (DE 45-20) 84:21–85:3; Lascala Dep. (DE 45-26) 44:10–13). Defendant and Oyster received their shared 10% commission of $48,500.00. (See Weare Dep. (DE 42-2) 98:23–99:5; March 29, 2017 Email (DE 42-7) at 2; Wurzbacher Dep. (DE 45-24) 100:4–6; Addendum to Closing Statement (DE 45-10)). Plaintiffs never received the balance of the purchase price. (Weare Dep. (DE 42-2) 77:13–19; Bennett Dep. (DE 42-1) 62:8–13; Leonard Dep. (DE 45-20) 83:14–21).

Additional facts pertinent to the instant motion will be discussed below.

# DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached

exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.  Analysis

The parties heavily contest the nature of their relationship. Plaintiffs' legal theory underpinning their breach of fiduciary duty and negligence claims is that defendant served as their escrow agent in the disputed transaction. Defendant vigorously opposes this argument, contending that it was the Leonards' broker and nothing more. The court addresses this legal contention before turning to each of plaintiffs' claims.

North Carolina law does not define "escrow agent." However, based upon a recent, well-reasoned opinion of the North Carolina Court of Appeals discussing escrows, the court defines an "escrow agent" as 1) a disinterested third party independent of parties to a transaction 2) that receives property from one party for delivery to the other party 3) upon performance of conditions jointly or separately set forth in instructions from the parties to a transaction. Johnson v. Schultz, 195 N.C. App. 161, 165, 169–170 (2009), aff'd and remanded, 364 N.C. 90, 93 (2010); see also

6

White v. Fisheries Prod. Co., 183 N.C. 228, 229 (1922) (describing an alleged parol escrow agreement where promissory notes were to be placed in a bank and, depending on if plaintiff sold his farm, the notes would become due or be returned to plaintiff); Gibson v. Partee, 19 N.C. 530, 533 (1837) (upholding the trial court's instruction that, where an instrument was executed as a mere escrow, and not intended to operate as a deed, it should be delivered to a third person, and not to the grantee).

In Johnson, the court considered whether the parties had created an escrow in a residential real estate transaction. In that case, the purchasers agreed to pay the balance of the purchase price in cash at closing. (Transcript of Record ("R.") at 72, Johnson v. Schultz, 195 N.C. App. 161 (2009) (No. 08-133)). The "conditions" in the "Offer to Purchase and Contract" included requirements that the buyer secure adequate financing, no restrictions prevent residential use of the property, the property being in substantially the same or better condition at closing that at time of the contract, all encumbrances not assumed by the buyer be paid by the seller, and that general warranty deed be delivered at closing. (R. at 72). Finding these conditions insufficient, the court held that "the record is completely devoid of any evidence tending to establish the creation of an escrow between the parties, including any escrow instructions to Mr. Parker from the buyers (the Schultzes), the sellers (the Johnsons), or the lender (State Farm Bank)." Johnson, 195 N.C. App. at 170. The court also gave weight to the fact that the agreement was not described as an "escrow agreement," and the buyer's attorney was not described as an "escrow agent." Id. at 170–71.

The undisputed facts demonstrate defendant was not an escrow agent in the instant transaction. First, defendant was never a disinterested third party in the transaction but was the Leonards' broker seeking to help them acquire a yacht. (See Weare Dep. (DE 42-2) 68:3–25; Rose Dep. (DE 42-5) 43:23–48:4, 49:4–51:12, 55:3–4; PSA (DE 42-6) at 3; Leonard Dep. (DE 45-20)

7

37:18–38:20). The terms of the purchase and sale agreement make clear that defendant was transmitting funds to plaintiffs in its capacity as "selling broker," not "escrow agent," indicating that defendant's duty to transmit the Leonards' funds arose from its responsibilities as the Leonards' agent. (Purchase and Sale Agreement (DE 42-6) at 2, 3).

Second, the purchase and sale agreement does not instruct defendant as to conditions that must be met before transmitting the balance of the purchase price to the Leonards. (Purchase and Sale Agreement (DE 42-6) at 2; see Lascala Dep. (DE 45-26) 37:15–23 (observing that funds are normally transmitted to the seller before buyers receive title to a vessel); Cox Expert Report (DE 45-1) at 13 (noting an escrow agent's responsibility is to transmit the purchase price to a seller "upon satisfaction of any conditions precedent")). Like the "Offer to Purchase and Contract" found deficient in Johnson, the purchase and sale agreement merely provides that Leonards were responsible for delivering the balance of the purchase price at closing and plaintiffs were responsible for delivering all documents necessary to transfer good and absolute title. (Purchase and Sale Agreement (DE 42-6) at 2). In sum, the instant transaction lacks an agreement instructing defendant on conditions precedent to delivering the balance of the purchase price to plaintiffs.

Plaintiffs argue that they controlled defendant's conduct because they "directed defendant as to where [to] transmit the Closing Funds." (Pl. Resp. (DE 43) at 9). The proposed closing statement sent by Rose seeks nothing more than confirmation from plaintiffs and Oyster of where to transmit money. (See Weare Dep. (DE 42-2) 73:2–12; Rose Dep. (DE 42-5) 81:20–83:6; March 29, 2017 Email (DE 42-7) at 1–2). Instruction on where to send payment is not a "precondition" that establishes an escrow arrangement. See Johnson, 364 N.C. at 93. In addition, plaintiffs' argument is inconsistent with the express terms of the purchase and sale agreement. See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354 (1970) ("[T]he court must

8

enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract."). As noted above, the purchase and sale agreement required defendant to act as the Leonard's agent. (Purchase and Sale Agreement (DE 42-6) at 3). One of the duties expressly contemplated by the purchase and sale agreement was for defendant, as selling broker, to transmit the Leonards' funds to plaintiffs. (Purchase and Sale Agreement (DE 42-6) at 2). Nowhere does the purchase and sale agreement, or the presentation of a closing statement to plaintiffs to verify where they would like to receive funds, implicate control over defendant's responsibility to deliver the funds to plaintiffs.

For purposes of this transaction, defendant was not plaintiffs' escrow agent. Defendant's role in the instant transaction was as the Leonards' broker. Having reached this determination as a matter of law, the court turns to each of plaintiffs' causes of action.

    1.    Breach of Fiduciary Duty

Plaintiffs contend that, because defendant acted as their escrow agent, defendant is liable for breach of fiduciary duty. "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." Sykes v. Health Network Sols., Inc., 828 S.E.2d 467, 475 (N.C. 2019) (citing Green v. Freeman, 367 N.C. 136, 141 (2013)).

Though North Carolina law does not precisely define what constitutes a fiduciary relationship, the law recognizes de jure fiduciary relationships and de facto fiduciary relationships. See King v. Bryant, 369 N.C. 451, 464 (2017) (quoting Abbitt v. Gregory, 201 N.C. 577, 598 (1931)); HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 588 (1991). Plaintiffs argue

9

that defendant was both a de jure and de facto fiduciary. The court addresses these arguments in turn.

"De jure" fiduciary relationships are those relationships that by their very nature give rise to fiduciary duties. CommScope Credit Union v. Butler & Burke, LLP, 369 N.C. 48, 52 (2016) (citing Dallaire v. Bank of America, N.A., 367 N.C. 363, 367 (2014) (listing categories of fiduciary relationships)). Two types of de jure fiduciary relationships are trustee and trustee beneficiary, and principal and agent. Id.; Abbitt, 201 N.C. at 597–98. "The list of relationships . . . held to be fiduciary in their very nature is a limited one, and we do not add to it lightly." Sykes, 828 S.E.2d at 475.

As discussed above, plaintiffs' argument that defendant was their escrow agent fails as a matter of law. For this reason, defendant did not have a de jure fiduciary relationship with plaintiffs.

De facto fiduciary relationships exist "[w]herever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." King, 369 N.C. at 464 (quoting Vail v. Vail, 233 N.C. 109, 114 (1951)). "Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir. 1998); see Eastover Ridge, L.L.C. v. Metric Constructors, Inc., 139 N.C. App. 360, 367 (2000) (holding that plaintiff hiring an architect with constant, close involvement in a construction contract eliminated any claim of a relationship of trust and confidence in the contractor).

The North Carolina Supreme Court "ha[s] been clear that general contractual relationships do not typically rise to the level of fiduciary relationships." Sykes, 828 S.E.2d at 475–76; see, e.g., Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 368 N.C. 440, 449 (2015) ("In an ordinary debtor-creditor transaction, the lender's duties are defined by the loan agreement and do not extend beyond its terms."); Dallaire, 367 N.C. at 368 (collecting cases). However, "special circumstances" created by contractual obligations can in certain situations give rise to fiduciary duties. Arnesen, 368 N.C. at 449.

Here, plaintiffs did not repose special confidence in defendant. It is undisputed that plaintiffs retained Oyster as their own agent. (See Vessel Brokerage Agreement (DE 42-3) at 1–2; PSA (DE 42-6) at 3). Plaintiffs worked with Oyster to negotiate mutually agreeable terms of sale and relied upon Oyster to advise them on the transaction. (See Weare Dep. (DE 42-2) 62:21–64:17, 69:1–6, 149:6–9; Wurzbacher Dep. (DE 42-4) 23:4–9). In responding to limited communications from defendant immediately prior to closing, plaintiffs communicated with defendant through Oyster. (See Weare Dep. (DE 42-2) 73:2–12; Rose Dep. (DE 42-5) 81:20–83:6; March 29, 2017 Email (DE 42-7) at 1–3). This included providing wiring instructions to defendant through Wurzbacher. (March 29, 2017 Email (DE 42-7) at 3). Moreover, plaintiffs were sophisticated actors with considerable business experience and previous experience buying and selling yachts. (See Weare Dep. (DE 42-2) 7:3–14:15, 21:16–31:13).

Plaintiffs reiterate their argument that defendant served as an escrow agent, arguing that they "relied on the details of the Closing Statement . . . when they provided their wiring instructions." (Pl. Resp. (DE 43) at 12). For the same reasons the court concludes that defendant did not consent to be an escrow agent for plaintiff, the court rejects plaintiffs' argument that Wurzbacher sending defendant plaintiffs' wiring instructions constitutes reposing special trust.

11

Plaintiffs' dealings with defendant were an arm's length commercial relationship facilitated by Oyster. Accordingly, the court grants summary judgment on plaintiffs' breach of fiduciary duty claim.

2.  Negligence

Plaintiffs claim that defendant was negligent in handling the sale proceeds. "To state a claim for common law negligence, a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Stein v. Asheville City Bd. Of Educ., 360 N.C. 321, 328 (2006); Martishius v. Carolco Studios, Inc., 355 N.C. 465, 473 (2002).

"Contributory negligence, as its name implies, is negligence on the part of the plaintiff which joins, simultaneously or successively, with the negligence of the defendant alleged in the complaint to produce the injury of which the plaintiff complains." Jackson v. McBride, 270 N.C. 367, 372 (1967). In order to establish contributory negligence, defendant must prove "(1) that plaintiff failed to exercise proper care in the performance of a legal duty which plaintiff owed to defendant under the circumstances in which they were placed; and (2) that such negligent breach of duty was a proximate cause of the injury suffered." Adams v. Mills, 312 N.C. 181, 187 (1984).

"In this state, a plaintiff's contributory negligence is a bar to recovery from a defendant who commits an act of ordinary negligence." Sorrells v. M.Y.B. Hosp. Ventures of Asheville, 332 N.C. 645, 648 (1992). Under North Carolina law, a plaintiff is barred from recovering against a negligent defendant where plaintiff's agent is contributorily negligent. Rollison v. Hicks, 233 N.C. 99, 105 (1951). "Only when plaintiff proves himself out of court is he to be nonsuited on the evidence of contributory negligence." Lincoln v. Atl. Coast Line R. Co., 207 N.C. 787, 789 (1935).

Assuming without deciding that plaintiffs can raise genuine issues of material fact as to all elements of negligence, plaintiffs' claim must be dismissed for contributory negligence. Here, it

is undisputed that Oyster, plaintiffs' broker, was negligent in protecting plaintiffs from financial loss. (See Weare Dep. (DE 42-2) 56:2–5, 83:11–21, 141:16–142:1). In a parallel arbitration proceeding against Oyster, plaintiffs' expert presented comprehensive, unrebutted opinions that Oyster 1) was negligent in handling plaintiffs' wiring instructions; 2) was negligent in handling transfer-of-ownership documents; 3) failed to take adequate steps to remediate loss of the closing proceeds; 4) failed to exercise reasonable care in conducting due diligence on defendant and Rose; and 5) repeatedly put its own interests ahead of plaintiffs. (Oyster Arbitration Report (DE 51-1) at 25). Defendant offers this report in support of its contributory negligence claim, and plaintiffs do not dispute the conclusions therein. Therefore, Oyster's negligence is imputed to plaintiffs, barring them from recovering against defendant.

Plaintiffs assert that one agent of a principal may not implead the negligence of another agent of that same principal to defeat liability. (Pl. Resp. (DE 52) at 4 (citing Olympic Prod. Co., A Div. of Cone Mills Corp. v. Roof Sys., Inc., 88 N.C. App. 315, 335 (1988)). Plaintiffs' argument depends on the rejected legal contention that defendant acted as an escrow agent with dual agency responsibilities.[5] (Pl. Resp. (DE 52) at 6–7). Because plaintiffs fail to establish that defendant and Oyster were both plaintiffs' agents, Olympic is inapplicable to the instant case.

The court grants summary judgment on defendant's contributory negligence defense and dismisses plaintiffs' negligence claim.

---

[5] To the extent plaintiffs rely upon their expert to render a legal conclusion as to what constitutes an escrow, such opinion is not admissible under the rules of evidence. See United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.").

13

3. Breach of Contract

Plaintiffs assert that defendant is liable for breach of contract. The court considers whether defendant may nonetheless be held liable for breach of the terms of the purchase and sale agreement as selling broker.

Ordinarily, a claim for breach of contract requires a plaintiff to prove "the existence of a contract between plaintiff and defendant, the specific provisions breached, [t]he facts constituting the breach, and the amount of damages resulting to plaintiff from such breach." Cantrell v. Woodhill Enterprises, Inc., 273 N.C. 490, 497 (1968). A contract, express or implied, requires mutual assent, mutuality of promises, and definite terms. See Horton v. Humble Oil & Refining Co., 255 N.C. 675, 679 (1961).

An agent is not liable for breach of contract made within the scope of its authority for its disclosed principal "unless the agent has, by contract or by his conduct, added his own liability to that of the principal." Howell v. Smith, 261 N.C. 256, 259 (1964) (citing Rounsaville v. North Carolina Home Insurance Co., 138 N.C. 191 (1905)); Way v. Ramsey, 192 N.C. 549, 551 (1926) (citing Caldwell County v. George, 176 N. C. 602 (1918)); Fowle v. Kerchner, 87 N.C. 49, 62 (1882); cf. Forbes Homes, Inc. v. Trimpi, 318 N.C. 473, 479–80 (1986) (holding an agent may be personally liable for damages caused to third persons by his fraud or false representations).

Viewing the facts in light most favorable to plaintiffs, defendant is liable for breach of the purchase and sale agreement resulting from its failure to transmit the Leonards' funds to plaintiffs. Together with Oyster, defendant negotiated the purchase and sale agreement on behalf of their principals. (Weare Dep. (DE 42-2) 62:21–64:12, 66:11–14; Wurzbacher Dep. (DE 42-4) 23:7–9; Rose Dep. (DE 42-5) 51:11–52:6, 55:3–4, 56:3–14, 68:18–23; Purchase and Sale Agreement (DE 42-6) at 1). The purchase and sale agreement provided that plaintiffs were to receive a total of

$485,000.00 for Magic, less commissions, from the Leonards. (See Purchase and Sale Agreement (DE 42-6) at 1, 2). The Leonards were responsible for delivering the balance of the purchase price to plaintiffs or to defendant "for transmittal to the SELLER." (Purchase and Sale Agreement (DE 42-6) at 2). As selling broker, the purchase and sale agreement contemplated that defendant would complete this task on behalf of the Leonards. (See Purchase and Sale Agreement (DE 42-6) at 3).

To carry out its task, defendant sent a proposed closing statement, solicited wire instructions, and held the funds from the Leonards. (Rose Dep. (DE 42-5) 81:20–83:6; March 29, 2017 Email (DE 42-7) at 2; Wire Receipt Apr. 5, 2017 (DE 45-8) at 1). That same day, Wurzbacher emailed Rose wiring instructions for Oyster and plaintiffs, and confirmed that Oyster and plaintiffs agreed to the closing statement. (Rose Dep. (DE 42-5) 86:5–21; Wurzbacher Dep. (DE 45-24) 188:3–22; March 29, 2017 Email (DE 42-7) at 3). Ultimately, defendant failed to transmit the balance of the purchase price to plaintiffs due to its own failure to protect itself from social engineering and funds transfer fraud. (See Rose Dep. (DE 42-5) 100:11–103:10; Coastal Computer Records (DE 45-2) at 1–8; Chance Dep. (DE 45-23) 16:10–17:7). A reasonable trier of fact could conclude that defendant, through its conduct as the Leonards' agent, is liable for breach of the purchase and sale agreement by undertaking and failing to transmit the balance of the purchase price to plaintiffs on behalf of the Leonards.

Defendant argues it has no contract with plaintiffs, relying on Walston v. R. B. Whitley & Co., 226 N.C. 537, 540 (1946). Defendant's reliance on Walston is misplaced. There, the North Carolina Supreme Court held that an agent is not liable for a contract made on behalf of a disclosed principal "in the absence of an agreement otherwise, or other circumstances showing that he has expressly or impliedly incurred or intended to incur personal responsibility." Id. Viewing the

facts in the light most favorable to plaintiffs, defendant impliedly incurred personal responsibility by undertaking to transmit the purchase funds to plaintiffs on behalf of the Leonards.

Defendant also argues the purchase and sale agreement exculpates it from liability should "payment be made in any form other than collected funds." The term "collected funds" means cash or its equivalent. See First Nat. Bank v. Davis, 114 N.C. 343, 348 (1894). By transmitting the balance of the purchase price by wire, the Leonards paid the balance of the purchase price in collected funds. (See Cox Aff. (DE 45-19) ¶ 10; Wire Receipt Apr. 5, 2017 (DE 45-8) at 1). Thus, the contract does not exculpate defendant for mishandling funds.

Defendant's motion for summary judgment on plaintiffs' breach of contract claim is denied.

4. Unjust Enrichment

Plaintiffs claim that defendant will be unjustly enriched should it be allowed to retain its commission from the instant transaction. A claim for unjust enrichment "operates as an equitable remedy based upon a quasi-contract or a contract implied in law which provides a measure of recovery for the reasonable value of services rendered." Ron Medlin Const. v. Harris, 364 N.C. 577, 580 (2010) (internal quotations omitted) (quoting Whitfield v. Gilchrist, 348 N.C. 39, 42 (1998); Potter v. Homestead Pres. Ass'n, 330 N.C. 569, 578 (1992)). To prevail on a claim for unjust enrichment, plaintiffs must 1) confer a benefit on defendant, 2) the benefit must not have been conferred officiously or gratuitously, 3) the benefit must be measurable, and 4) defendant must have consciously accepted the benefit. Booe v. Shadrick, 322 N.C. 567, 570 (1988) (citing Wells v. Foreman, 236 N.C. 351 (1952)). Where a benefit is given pursuant to a contract, "the contract governs the claim and the law will not imply a contract." Id. (citing Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713–14 (1962)).

Here, defendant received a $24,250.00 commission. (See March 29, 2017 Email (DE 42-7) at 1–2; Closing Statement Addendum (DE 45-10) at 1). Defendant argues that Oyster paid its commission, while plaintiffs argue they paid defendant's commission. Regardless of the source of defendant's commission, the commission was unmistakably given pursuant to a contract. (See Purchase and Sale Agreement (DE 42-6) at 2 (providing that plaintiffs would pay the brokers their commissions); Vessel Brokerage Agreement (DE 42-3) at 1 (providing that Oyster agreed to pay defendant a percentage of its commission)). Accordingly, plaintiffs' unjust enrichment claim fails as a matter of law. See Vetco Concrete, 256 N.C. at 713–14.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 38) is GRANTED IN PART and DENIED IN PART. Plaintiffs' breach of fiduciary duty, negligence, and unjust enrichment claims are DISMISSED. Where plaintiffs' breach of contract claim remains for trial, in accordance with the court's case management order entered November 27, 2017, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within **14 days** from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. In addition, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such.

SO ORDERED, this the 23rd day of January, 2020.

 _____
 LOUISE W. FLANAGAN
 United States District Judge

17